* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and arguments before the Full Commission. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. All parties are properly before the Commission and the Commission has jurisdiction over the parties and the subject matter.
3. At all times relevant to this claim, an employer-employee relationship existed between the parties.
4. Plaintiff last worked on November 27, 2003.
5. Plaintiff alleges an occupational injury to his upper and lower spine, neck, arms, hands and legs.
6. American Home Assurance Company (ESIS, Inc.) is the carrier on the risk.
7. Plaintiff's average weekly wage is $674.00 per week, which is the maximum weekly benefit for 2003.
8. In addition, the parties stipulated into evidence the following:
 a) Medical records from Howe Street Internal Medicine, Dr. Daniel Tesfaye, Atlantic Orthopedics, and The Center for Pain Management.
b) Industrial Commission Form 18 and Form 33.
 c) Supervisor's accident investigation report and other documents from the employer's records, including performance evaluations.
 d) Letter from Janet C. Lopatofsky to plaintiff dated April 7, 2004.
e) Letter from Scott West to plaintiff.
 f) Letter from Dianne Wood to plaintiff dated June 16, 2004.
g) Income protection claim.
 h) Letter from Talin Ovanespour to plaintiff dated May 3, 2004.
i) Nuclear Regulatory Commission Rules from 10 CFR.
j) Long-term disability policy and documents.
 k) Disability Payment Options/Reimbursement Agreement.
 l) Defendants' Amended Response to Plaintiff's Interrogatories.
 m) Documents submitted by defendants on July 12, 2005.
 n) Documents submitted by plaintiff in response dated July 25, 2005.
9. The Pre-Trial Agreement dated April 13, 2005, which was submitted by the parties, is incorporated by reference.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 51 years old. Plaintiff is a high school graduate and has completed some college courses in criminal justice. Plaintiff worked for defendant-employer, an independent company that provides security services for the Brunswick Nuclear Power Plant (hereafter "power plant"). Plaintiff worked at the power plant for 28 years as a security officer and supervisor, under different employers.
2. Since 1978, plaintiff was a lieutenant and supervised three sergeants and approximately 20 armed guards. His regular schedule called for 12-hour shifts for three days followed by three days off work. However, in 2002 and 2003, defendant-employer had staff shortages and plaintiff worked many extra shifts. Plaintiff's duties included clearing power plant employees into the facility at shift changes, patrolling the facility, checking on the guards in his unit and doing administrative paperwork in his office. He was also required to perform all of the duties of a non-officer guard if necessary and, by the nature of his work, was generally on the lookout for security problems. Approximately 65 percent of his shift was spent walking through the plant.
3. After the terrorist attacks on September 11, 2001, security guards at nuclear power plants were required by federal regulations to be more heavily armed and wear more safety gear. Consequently, plaintiff was required to carry a semi-automatic rifle or shotgun, a handgun, many rounds of ammunition for each weapon, a facemask, a radio and other equipment, and he had to wear body armor. The total weight of the gear was approximately 40 pounds. The rifle or shotgun hung from a sling around his neck and rounds of bullets hung from his shoulders in bandoliers or were in the pockets of his bulletproof vest. Plaintiff felt weighed down and restricted in his movement by all of the gear he wore. Plaintiff wore the gear at all times, except he was not required to wear his rifle when he processed employees at shift changes. In addition, while working at his desk, plaintiff's rifle rested across his lap so the weight would not be around his neck and shoulder.
4. In late 2002 or early 2003, plaintiff began to notice a tingling sensation in his right hand, followed by a similar sensation in his left hand that subsequently spread to his arms. Plaintiff also developed a burning feeling in his legs. On June 17, 2003, plaintiff went to Dr. Daniel McCallum, his family doctor, with these complaints and was referred to Dr. Daniel Tesfaye, a neurologist. On July 29, 2003, Dr. Tesfaye examined plaintiff and found his reflexes to be overly brisk, a sign of myelopathy or a problem with the spinal cord. Dr. Tesfaye ordered an MRI of plaintiff's cervical spine. The MRI revealed degenerative disc disease at C5-6 and C6-7 with mild to moderate canal stenosis and confirmed the spinal cord injury, which resulted from compression of the spinal cord due to application of pressure from above. At his deposition Dr. Tesfaye explained that people who do manual work or are heavily involved in lifting or carrying tend to develop more cord problems than people doing sedentary work. Dr. Tesfaye also ordered electrodiagnostic nerve testing which showed evidence of cervical radiculopathy. Consequently, Dr. Tesfaye referred plaintiff to a neurosurgeon for possible surgery.
5. On August 22, 2003, plaintiff was evaluated by the physician's assistant of Dr. R. Mark Rodger, an orthopedic spine surgeon. Plaintiff then underwent a myelogram/CT scan before seeing Dr. Rodger on October 8, 2003. On that date, plaintiff continued to have symptoms in his arms and right leg, but he denied having back or neck pain. Dr. Rodger reviewed the latest test results and concluded that plaintiff had evidence of spinal cord damage at C5-6 and both spinal stenosis and foraminal stenosis at C5-6 and C6-7. There was also evidence of spinal stenosis and a bulging disk at L4-5 in the lumbar spine, but it appeared at that time that the leg symptoms were more likely due to a progressive myelopathy associated with the stenosis in the cervical spine. Consequently, the doctor recommended surgery to the cervical spine.
6. On December 1, 2003, Dr. Rodger performed surgery to decompress and fuse the C5-6 and C6-7 interspaces. Although the operation successfully removed the pressure from the spinal cord at that area, the spinal cord had already sustained damage due to the pressure from the stenosis, so plaintiff continued to experience symptoms in his arms afterwards. Plaintiff has progressive myelopathy, which involves progressive dysfunction of his spinal cord in his cervical spine as the result of damage to the cervical spine and degenerative disc disease. Plaintiff also developed carpal tunnel syndrome in the right wrist from unknown causes, which also contributed to his symptoms in that hand and arm.
7. In addition, plaintiff continued to experience a burning sensation in his right leg. Dr. Rodger referred plaintiff to The Center for Pain Management for epidural steroid injections, and, on March 26, 2004, Dr. Charles Joachim examined plaintiff. Plaintiff had also developed some low back pain, but he did not want to undergo an epidural steroid injection, so Dr. Joachim treated plaintiff with medications. Dr. Rodger then ordered a repeat myelogram/CT scan, which revealed a stable fusion and an open spinal canal. Dr. Rodger recommended that plaintiff follow up with the pain clinic for symptomatic treatment. Both Dr. Rodger and Dr. Joachim encouraged plaintiff to have an epidural steroid injection to his lumbar spine to see if it would help with the leg pain, but plaintiff continued to reject that procedure and pursued medication management with Dr. Joachim through 2004. Plaintiff finally underwent transforaminal epidural steroid injections in January and February 2005, but they did not provide him with significant relief.
8. Following the epidural injections, Dr. Rodger ordered nerve testing. The results of the nerve testing were consistent with a problem due to spinal stenosis in his lumbar spine. At his deposition, Dr. Rodger concluded that plaintiff's leg pain was due, at least in part, to lumbar radiculopathy and explained that he had discussed surgical options with plaintiff.
9. Plaintiff did not sustain any known injury to his neck or low back during his employment with defendant-employer. Plaintiff continued working for the security company until November 27, 2003, which was right before his operation, and had not returned to work at the time of the Deputy Commissioner's hearing. Plaintiff's claim for workers' compensation benefits has been made on the basis of an occupational disease rather than an injury at work.
10. At his deposition, Dr. Tesfaye testified that although plaintiff had asymptomatic degenerative disc disease prior to September 11, 2001, he strongly felt that the load of gear plaintiff carried at work, as well as the length of time he carried the gear, had a significant impact on his condition and contributed to plaintiff's current disability. Dr. Tesfaye further explained that plaintiff's working conditions significantly aggravated his pre-existing condition. Dr. Tesfaye also stated that degenerative disc disease was an ordinary disease of life for which the general public is at risk.
11. At his deposition Dr. Rodger stated that plaintiff is unable to return to his job in the security field. Dr. Rodger testified to a reasonable degree of medical certainty that plaintiff's job significantly contributed to the conditions for which he treated plaintiff based on the load of gear and length of time plaintiff carried it. Dr. Rodger explained as follows:
 The load that he wears on his head, the load that he places around his shoulders, the secondary contraction of his cervical muscles that result in the load to his discs clearly increase the wear or work that's been done on his neck. Force times distance resulting in the increasing wear. If he already had a degenerative disc disease, he was a neck at risk and did not require a lot of extra stress in order to make him symptomatic. I think that the amount of extra time he placed -72 hours a week . . . with the extra weight going from 15 to 40 pounds of motion and plus the use of body armor, which my personal experience has been that that increases the necessity for range of motion of your neck. I think that the range of motion of the neck, the force is applied, similarly muscle forces are applied, reasonably we expect it to increase the wear and therefore result in the symptoms that he has, those of nerve root compression and spinal cord damage.
Dr. Rodger also stated that it was more likely than not that plaintiff's working conditions increased the risk "for his disease that he presents with and the mechanism of that risk as we mentioned previously." Dr. Rodger further stated that heavy laborers are at an increased risk for contracting degenerative disc disease in the neck.
12. As a result of his cervical spine stenosis, Dr. Rodger performed surgery on plaintiff, which relieved the pressure on the spinal cord and prevented further compression. From November 28, 2003 through the date of Deputy Commissioner's hearing on April 13, 2005, plaintiff was unable to work in any capacity due to his occupational diseases. Dr. Rodger had not released plaintiff to perform any work until he had undergone further studies. As of the date of the Deputy Commissioner's hearing, plaintiff continued to experience debilitating neck and arm symptoms which not only kept him from returning to work as a security guard but which also resulted in a dramatic change in his other activities.
13. The Commission finds that the greater weight of the medical testimony established that with respect to his cervical spine, plaintiff was placed at an increased risk of developing degenerative disc disease and accompanying spinal cord damage because he had to carry and wear so much heavy gear during the last two years of his employment. Plaintiff's shoulders had to bear much of the weight he was carrying. The unusual load on plaintiff's shoulders caused contraction of the cervical muscles and placed a load on the discs in his neck so that the discs wore at an increased rate.
14. The Commission also finds, however, that the medical evidence did not establish that plaintiff's working conditions placed him at an increased risk of developing degenerative disc disease in his lumbar spine or carpal tunnel syndrome or that his work conditions were a significant contributing factor in the development of his lumbar spinal stenosis or carpal tunnel syndrome.
15. Plaintiff had not reached maximum medical improvement as of the date of the Deputy Commissioner's hearing. Plaintiff has not worked and has been disabled from any employment since November 28, 2003.
16. Defendants are entitled to a credit for long-term disability benefits paid to plaintiff beginning November 28, 2003, unless plaintiff repaid the benefits to the disability insurer.
17. Defendants failed to comply with the law and Industrial Commission rules and failed to file or timely file required Industrial Commission forms. On April 23, 2004 plaintiff filed with the Commission a Form 18 Notice of Accident and a Form 33 Request for Hearing. Shortly thereafter, plaintiff served Rule 607 discovery requests on defendants. Defendants filed no response to either form until December 2004. Defendants repeatedly failed to respond to plaintiff's Rule 607 discovery requests. In addition, defendants failed to comply with the Commission order for mediation by failing to respond to plaintiff's selection of a proposed certified mediator.
18. On September 30, 2004, plaintiff's filed a motion requesting to be relieved from mediation, as well as a motion to compel responses from defendants from the previous Rule 607 discovery request. Defendants did not respond to either motion. On October 20, 2004, the Executive Secretary issued an order directing defendants to comply with plaintiff's Rule 607 request within 10 days. Defendants did not respond and failed to comply with the Executive Secretary's order. On December 7, 2004, plaintiff filed with the Commission a motion for default or for sanctions. By letter on December 16, 2004, defense counsel advised that he had been retained to represent defendants and that he would be promptly complying with the Rule 607 requests, but none were forthcoming. On March 29, 2005, weeks prior to the Deputy Commissioner's hearing on April 13, 2005, defendants responded to discovery requests that the Nuclear Regulatory Commission rules prevented disclosure of certain requested information. Although defendants may have been prohibited by the NRC from making certain disclosures, defendants presented no evidence explaining the nearly one-year delay in making any response to discovery requests or the failure to comply with the order of the Executive Secretary in a timely manner. Defendants' failure to comply with the Workers' Compensation Act and to file or timely file appropriate forms resulted in additional expenditures of time on the part of plaintiff's counsel and frustrated the workers' compensation process and the intent of the Act. Consequently, in the discretion of the Commission, appropriate reasonable sanctions should be assessed against defendants.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him to a greater risk of contracting the disease than the public generally. Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983). In addition, the claimant must show that the employment significantly contributed to, or was a significant causal factor in, the disease's development. Hardin v. MotorPanels, Inc., 136 N.C. App. 351, 524 S.E.2d 368 (2000) (citingRutledge v. Tultex Corp., supra). Even where the condition was aggravated but not originally caused by the claimant's employment, a claimant must show that the employment placed him at a greater risk for contracting or developing the condition.Futrell v. Resinall Corp., 357 N.C. 158, 579 S.E.2d 269 (2003).
2. In the present case, plaintiff's pre-existing asymptomatic degenerative disc disease was aggravated by the duties of his employment. Plaintiff was placed at an increased risk of developing symptomatic degenerative disc disease in his cervical spine and accompanying spinal cord damage by virtue of his working conditions with defendant-employer. Thus, plaintiff's cervical condition was an occupational disease that was due to causes and conditions characteristic of and peculiar to his employment and which was not an ordinary disease of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53
(13); Booker v. Medical Center, 297 N.C. 458, 256 S.E.2d 189
(1979); Futrell v. Resinall Corp., supra.
3. Because plaintiff's claim was denied, plaintiff has the burden of proving disability, defined as a loss of wage earning capacity. Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993). Sims v. Charmes/Arby's Roast Beef,142 N.C. App. 154, 542 S.E.2d 277 (2001). In order to meet the burden of proving disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. Apex CabinetCo., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of proof by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution, supra. When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms, Inc., supra.
4. In the instant case, the medical evidence shows that plaintiff was disabled from any employment from November 28, 2003 through the date of the Deputy Commissioner's hearing and continuing. Therefore, as the result of his cervical spine condition, plaintiff met his initial burden to show that he is disabled.
5. Defendants have not shown that suitable jobs are available for plaintiff and that plaintiff is capable of obtaining a suitable job, taking into account plaintiff's physical, mental and vocational limitations. Demery v. Perdue Farms, Inc.,supra.
6. As a result of his compensable cervical spine condition, plaintiff was disabled and is entitled to receive temporary total disability compensation at the rate of $674.00 per week from November 28, 2003 and continuing until he returns to work or until further Order of the Commission. N.C. Gen. Stat. § 97-29.
7. Defendants are entitled to a credit for long-term disability benefits paid plaintiff beginning November 28, 2003, unless plaintiff repaid the benefits to the disability insurer. N.C. Gen. Stat. § 97-42.
8. Plaintiff's lumbar degenerative disc disease and carpal tunnel syndrome are not occupational diseases which were due to causes and conditions characteristic of and peculiar to his employment with defendant-employer and which excluded all ordinary diseases of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53 (13); Booker v. Medical Center,supra. Thus, plaintiff is not entitled to benefits under the Workers' Compensation Act for his lumbar spine condition or carpal tunnel syndrome. N.C. Gen. Stat. § 97-2 et seq.
9. Plaintiff is entitled to have defendants provide all medical treatment arising from his occupational disease to his cervical spine. Plaintiff is not entitled to have defendants provide treatment for his lumbar spine condition or for his carpal tunnel syndrome, which are conditions unrelated to his occupational disease. N.C. Gen. Stat. §§ 97-2(19); 97-59.
10. Defendants failed to file or timely file forms including a Form 19, Form 33R or a Form 61. Furthermore, defendants failed to respond in a timely manner to plaintiff's Rule 607 discovery requests and failed to comply with Orders of the Commission, in violation of Industrial Commission Rules. Consequently, in the discretion of the Commission, appropriate sanctions should be assessed against defendants including sanctions to be paid to the Commission as well as reasonable attorney's fees to be paid to plaintiff's counsel. N.C. Gen. Stat. § 97-18; Industrial Commission Rules 104, 601, 603 and 802.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff for temporary total disability as a result of his cervical spine condition at the rate of $674.00 per week from November 28, 2003 and continuing until plaintiff returns to work or until further Order of the Commission. That portion of this compensation which has accrued shall be paid in a lump sum. This award is subject to the attorney's fee approved in paragraph 3 below.
2. Plaintiff's claim for workers' compensation benefits for his lumbar degenerative disc disease and for carpal tunnel syndrome is hereby DENIED.
3. Defendants shall pay all medical expenses incurred by plaintiff as a result of his occupational disease to his cervical spine. Defendants are not required to provide treatment for plaintiff's lumbar spine condition or for his carpal tunnel syndrome, which are conditions unrelated to his occupational disease.
4. Defendants are entitled to a credit for long-term disability benefits paid plaintiff beginning November 28, 2003, unless plaintiff repaid the benefits to the disability insurer.
5. A reasonable attorney's fee of 25% of the accrued compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be paid directly to plaintiff's counsel.
6. Plaintiff's counsel has submitted an affidavit showing 35.3 hours spent on the issue of monetary sanctions against defendants. A reasonable attorney's fee of $2,500.00 is approved for plaintiff's counsel and shall be paid by defendants to plaintiff's counsel as sanctions for failure to comply with the statutes and Industrial Commission Rules.
7. Defendants shall pay reasonable sanctions of $1,000.00 to the Industrial Commission for failure to comply with Industrial Commission Rules and orders.
8. Defendants shall pay the costs.
This 9th day of May 2006.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER